UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CORA MITCHELL,

      Plaintiff,

v.

CITY OF WARREN, *et al.*,

      Defendants.
      _____/

Case No. 09-11480

Hon. John Corbett O'Meara

**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

Before the court is Defendants' October 7, 2011 motion for summary judgment. The motion has been fully briefed. The court heard oral argument on December 8, 2011, and took the matter under advisement. For the reasons explained below, the court grants in part and denies in part Defendants' motion.

**BACKGROUND FACTS**

Plaintiff Cora Mitchell ("Plaintiff") is the personal representative of the estate of her deceased son, Robert Mitchell. Plaintiff filed the present action for excessive force and wrongful death on April 20, 2009, under the Fourth and Fourteenth Amendments of the United States Constitution as well the state law of Michigan.

On April 10, 2009, Mitchell, age 16, was the passenger in a vehicle that was pulled over by Defendant Raymond Henke and his partner, both Warren police officers. Mitchell fled from the stopped vehicle into an abandoned house just south of Eight Mile Road in the City of Detroit.

Henke pursued Mitchell by foot from the scene of the traffic stop into the abandoned house. Henke was joined at various points by three or four Detroit police officers and two fellow Warren police officers, Scott Taylor and Defendant Jesse Lapham.

Inside the house, Henke shouted for Mitchell, who had run to the second floor, to come downstairs. Mitchell descended with his arms outstretched, as ordered. The facts are in dispute as to what occurred next, once Mitchell reached the bottom of the stairs. However, it is clear that Henke attempted to take physical control of Mitchell and that Lapham deployed his taser on Mitchell. It is undisputed that Mitchell then fell to the floor and died.

## LAW AND ANALYSIS

Each of the five claims from Plaintiff's complaint will be analyzed in turn below with respect to this motion. However, this motion pertains to only three of the four defendants: Henke, Lapham, and Police Commissioner William Dwyer. The parties intend to address Plaintiff's claims against the City of Warren at a later date.

**I.    Summary Judgment Standard**

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When reviewing a motion for summary judgment, the facts and any reasonable inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The party opposing summary judgment, however, must present more than a "mere scintilla" of evidence; the evidence must be such that a reasonable jury could find in favor of the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**II.      Excessive Force**

Plaintiff claims that Henke and Lapham violated Mitchell's rights under the Fourth and Fourteenth Amendments to the United States Constitution as well as Article 1, Section 11, of the Michigan Constitution by using excessive force against Mitchell. Plaintiff asserts that Lapham's use of his taser on Mitchell constituted excessive force and that Henke failed to properly intervene and protect Mitchell from Lapham's taser or prevent Lapham from tasing Mitchell.

Defendants argue that Henke and Lapham's actions toward Mitchell did not constitute an excessive use of force because they were objectively reasonable given all of the circumstances. Defendants further argue that even if Henke or Lapham's actions constituted excessive force, both officers are protected from liability under the doctrine of qualified immunity.

*A.      Excessive Force*

In *Graham v. Connor*, the Supreme Court made clear that the analysis of whether "force used to effect a particular seizure is 'reasonable' under the Fourth Amendment" is essentially a factual one which asks if the actions in question were objectively reasonable under all of the circumstances "from the perspective of a reasonable officer on the scene." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The inquiry excludes consideration of motive or intent and the "20/20 vision of hindsight," recognizing that "police officers are often forced to make split-second judgments" in "tense, uncertain, and rapidly evolving" situations. *Id*. Relevant factors for consideration include: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id*; *Cole v. City of Dearborn*, 2011 U.S. App. LEXIS 23761, (6th Cir. 2011); *Fox v. DeSoto*, 489 F.3d 227, 236-37 (6th Cir. 2007).

3

1. Lapham

Plaintiff argues that Lapham's use of his taser on Mitchell was objectively unreasonable under the three "non-exhaustive" *Grahm* factors. *See City of Dearborn*, LEXIS 23761 at *10. While Defendants contend that fleeing from police officers is a severe crime – a felony – in Michigan, Plaintiff believes that Mitchell's flight from a vehicle with expired plates was "moderate," at worst, and not severe. Defs' Mot at 12 (citing M.C.L. 750.479a(2) which makes it a felony to flee from Michigan police); Pl.'s Resp. at 12 (citing *Gaddis v. Redfored Twp*., 364 F.3d 763 (6th Cir. 2004)).

Plaintiff emphasizes that Mitchell's youth, small stature, and compliance in descending the stairs with his hands outstretched rendered him no threat at all. Plaintiff further notes that Mitchell was far outnumbered in the house by police officers larger than him, and asserts that the testimony of the officers present establishes, at most, that Mitchell was passively rather than actively resisting Henke.

Detroit Police Officer Daniel Burmistrzak testified that when Mitchell reached the bottom of the stairs, he was "breathing very heavily" and "sweating profusely" and that, given his position in the house relative to all police officers, it would have been "totally impossible" for him to have escaped. Burmistrzak further testified that, at that same point, both Henke and Detroit Police Officer Scott Taylor grabbed Mitchell. And despite the pushing and flinging reported by Lapham and Henke, Burmistrzak testified only that Mitchell rocked back and forth and appeared "really nervous" while Henke and Taylor were holding him.

Viewing the facts in the light most favorable to Plaintiff, it seems that Henke and Taylor had established relative control over Mitchell and that he posed very little risk just before being

tased by Lapham. Henke and Lapham admit that if Burmistrzak's description of the events is taken as true, then tasing Mitchell was "clearly unreasonable."

In addition, it is undisputed that Lapham did not issue a verbal warning to Mitchell before tasing him. Plaintiff cites the Warren Police Department policy which mandates that officers give verbal warning, if possible, before deploying tasers. The Department's policy also recognizes graduated levels of force to be applied proportionally to various threats or levels of resistance. Plaintiff maintains that Mitchell's conduct warranted, at most, "soft empty hand control" and not a taser.

From the testimony of the different police officers alone, there is a material question of fact as to whether Lapham's use of his taser on Mitchell was objectively reasonable under the circumstances. The court will therefore deny Defendants' motion with respect to Lapham's alleged use of excessive force.

      2.    <u>Henke</u>

Plaintiff contends that Henke, who held Mitchell as Lapham tased him, is liable for Lapham's use of excessive force. The Sixth Circuit has held that police officers may be liable for the use of excessive force by other officers where: (1) the officer observed or had reason to know that excessive force would be used or was being used; and, (2) the officer had both the opportunity and the means to prevent that harm from occurring. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

Henke testified that he neither saw the red laser sight beam on Mitchell's body prior to the tasing nor heard Lapham use the standard pre-taser deployment warning to other officers. Nevertheless, Plaintiff believes that Henke's proximity to Mitchell at the time of tasing and other

officers' sightings of the red laser beam gives rise to a question of fact as to whether Henke truly saw the red beam, and thus had an opportunity to intervene.

Plaintiff's arguments fail under Sixth Circuit precedent that holds that officers do not have a duty to intervene "where an entire incident unfolds in a matter of seconds" or where they have no "realistic opportunity" to prevent the attack. *Ontha v. Rutherford County, Tenn.*, 222 F. App'x 498, 506 (6th Cir. 2007); *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 348 (6th Cir. 2007). Henke testified that he did not, in fact, see the red beam. Even if he had, however, it is undisputed that the entire event from the time Mitchell reached the bottom of the staircase to Lapham's taser deployment was a matter of seconds. Thus, any red beam sighting must have been of an even shorter duration and did not provide a "realistic opportunity" to prevent the use of the taser.

Moreover, the spirit of the precedent cited by both parties suggests simply that officers may not stand by and allow fellow officers to unnecessarily abuse suspects for more than *de minimus* periods of time. There is no such evidence here given the timing and description of events in the record. Thus, the court will grant Defendants' motion with respect to Henke's alleged failure to intervene.

### B. Qualified Immunity

Defendants Henke and Lapham are protected by qualified immunity for discretionary acts performed within their scope of official duty unless those acts are "objectively unreasonable in light of [a] clearly established constitutional right." *Feathers v. Aey*, 319 F.3d 843, 847-48 (6th Cir. 2003). *See also Saucier v. Katz*, 533 U.S. 194, 201-202 (2001). Substantively, there is significant overlap between determining whether the force used was excessive and determining whether defendants are immune from liability for their use of such force. A plaintiff may

sometimes have a valid claim on the former but not the latter if, for example, the constitutional right in question is not clearly established. This is not the case here, however.

Mitchell did have a clearly established Fourth Amendment right to be free from excessive force, which Defendants mischaracterize too narrowly as Mitchell's "right to be free from Lapham's single use of the Taser." Defs.' Mot at 15. While there may be many meritorious reasons for using tasers, a taser is ultimately a "mere instrument[] of force." Pl.s' Resp. at 15, 16. Therefore, whether Henke and Lapham are protected by qualified immunity turns on essentially the same analysis as above for excessive force, and the parties reiterate substantially the same arguments. Accordingly, the court will deny Defendants' motion with respect to qualified immunity for Lapham and grant the motion in favor of Henke.

### III.   Equal Protection and Invidious Racial Animus

#### A.   *Equal Protection*

Plaintiff claims that Defendants unlawfully targeted African Americans, including Mitchell, along Eight Mile Road in the City of Warren by stopping and arresting them at disproportionately higher frequencies than other races. To state a § 1983 equal protection claim, a plaintiff must show: (1) that he was treated differently from a similarly situated group; and, (2) that the defendants acted with an intent or purpose to discriminate against him based upon his membership in a protected class. *Herron v. Harrison*, 203 F.3d 410, 417 (6th Cir. 2000). In an effort to make such a showing, Plaintiff relies on a single statistic about the percentage of African Americans arrested in Warren during 2009. Pl.'s Resp. at 27 (citing *United States v. Saucedo*, 226 F.3d 782, 790 (6th Cir. 2000) (explaining that plaintiffs can use statistical evidence to show that they were the target of racial profiling and denied equal protection).

7

At this time, Plaintiff has not presented sufficient facts to support an equal protection claim. Plaintiff points to little more than a general statistic, which Defendants persuasively rebut as insufficiently related to Lapham and Henke's stop of Mitchell. Moreover, Defendants assert that the vehicle in which Mitchell was a passenger was stopped for expired license plates and not out of any discriminatory intent. Although summary judgment may well be appropriate on this claim, Plaintiff notes that her discovery on this claim is incomplete and asks the court to defer its decision until it is. Pl.'s Resp. at 26, 27 (citing Ex. 24, Rule 56(d) Affidavit). The court will deny Defendants' motion without prejudice, giving Plaintiff an opportunity to complete discovery.

### B.   *Conspiracy Invidious Racial Animus*

Plaintiff further claims that Defendants conspired to violate Mitchell's constitutional rights with invidious racial animus. To state a § 1985(3) claim for conspiracy, a plaintiff must show that the defendants: (1) conspired together, (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the law and, (3) committed an act in furtherance of the conspiracy, (4) which cause injury to person or property, or deprivation of any right or privilege of a citizen of the United States, and (5) that the conspiracy was motivated by racial or other class-based invidiously discriminatory animus. *Radvansky v. City of Olmsted Falls,* 395 F.3d 291, 314 (6th Cir. 2005).

Again, Plaintiff's claim here is unsupported. Plaintiff alleges no facts to support a conspiracy claim. The court is inclined to grant summary judgment in Defendants' favor, but it will allow Plaintiff to complete the discovery she seeks in the event that facts are uncovered to support this claim. Pl.'s Resp. at 27 (citing Ex. 24, Rule 56(d) Affidavit). Accordingly, the court will deny Defendants' motion without prejudice on this issue.

### IV. Dwyer as an Individual

Plaintiff claims that in his official and individual capacity, the Commissioner of the Warren Police Department, Defendant William Dwyer, acquiesced to and ratified policies which allowed or promoted the excessive use of force by Warren police officers, particularly with respect to tasers.

Defendants note that suing Dwyer in his official capacity is equivalent to suing the governmental entity itself and such claims will be addressed in a separate motion. Defs' Mot. at 9 (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

With respect to claims against Dwyer in his individual capacity, Plaintiff must "point to specific action" where Dwyer "played an active role in the alleged violations" to defeat Dwyer's qualified immunity. *Phillips v. Roane Cnty. Tenn.*, 534 F.3d 531, 544 (6th Cir. 2008); *Greene v. Barbe*r, 310 F.3d 889, 899 (6th Cir. 2002). Plaintiff does not assert evidence that creates a direct causal nexus between any specific action taken by Dwyer and Lapham's tasing of Mitchell. Plaintiff does raise a number of factual questions pertaining to whether Dwyer perhaps allowed a culture of lax policy on taser use. *See* Pl.'s Reply at 7-9, 24-26 (citing what Plaintiff believes are bias and perfunctory investigations and premature exonerations that amount to ratification of policy which ultimately caused Mitchell's death).

However, Defendants correctly note that the causal connection Plaintiff draws between any policy Dwyer allegedly allowed or promoted and Lapham's tasering of Mitchell is tenuous and more germane to Dwyer's official capacity. As such, Dwyer's qualified immunity for his individual actions does not seem to be successfully challenged here. Plaintiff again requests additional time to complete discovery, however. *See* Pl.'s Resp. at 24 n.25 (explaining that despite repeated attempts, Plaintiff has not yet had the chance to depose Dwyer). Although

9

summary judgment may well be appropriate here too, the court will allow the parties to complete discovery and deny Defendants' motion on this point without prejudice.

## V. Interference with Familial Relations

Plaintiff claims that Defendants unconstitutionally interfered with her right to familial relations with her son, Mitchell. Defendants argue that there is no remedy of damages for violations of the Michigan Constitution, and Plaintiff does not respond. Defs.' Mot. at 23 (citing *Jones v. Powell*, 462 Mich. 329; 612 N.W.2d 423 (2000)). Additionally, *Kottmyer* does not stand directly for the proposition that the Sixth Circuit adopted a right of familial association "arising from the killing of a child by a state actor," as Plaintiff intimates. Pl.'s Resp. at 28; *Kottmyer v. Mass*, 436 F.3d 684, 690 (6th Cir. 2006). The *Kottmyer* court merely mentions that other circuits have recognized such a right in due process claims but does not adopt the same approach. In fact, as Defendants point out, the Sixth Circuit has specifically avoided creating such a right. *Purnell v. City of Akron*, 925 F.2d 941, 948 n.6 (6th Cir. 1991). All other precedent cited by Plaintiff is from other circuits or related to rights distinct from those of a family member surviving a decedent killed by a state actor. As such, Plaintiff fails to state a legally cognizable claim and Defendants' motion will be granted.

## VI. Wrongful Death

Defendants also seek dismissal of Plaintiff's claim under the Michigan Wrongful Death Act. However, Plaintiff invokes the Michigan Wrongful Death Act only insofar as it provides a mechanism for collecting damages for Plaintiff's § 1983 claims, and not as an independent ground for relief. It is clear that § 1988 allows § 1983 plaintiffs to "include remedies available under state statutes" like the Wrongful Death Act as a means of collecting damages in circumstances like this where Plaintiff is a decedent's estate and the decedent perished as a result

of constitutional violations. *See* Pl.'s Resp. at 29 (citing *Jaco v. Bloechle*, 739 F.2d 239 (6th Cir. 1984)). Defendants' arguments for immunity from tort liability under the Wrongful Death Act are thus inapposite. Therefore, the court will deny Defendants' motion with respect to Plaintiff's claims for damages under the Michigan Wrongful Death Act.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that Defendants' October 7, 2011 motion for summary judgment is GRANTED IN PART and DENIED IN PART, consistent with this opinion and order.

Date: February 9, 2012                                    s/John Corbett O'Meara
                                                                            United States District Judge


I hereby certify that a copy of this Opinion and Order was served upon counsel of record on this date, February 9, 2012 using the ECF system.

                                                                            s/William Barkholz
                                                                            Case Manager