# Exhibit 35

1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CRUZ

```
DAVID BUTLER, as Conservator of    )
the Person and Estate of Steven    )
Alan Butler,                       )
                                   )
           Plaintiffs,             )
                                   )
     vs.                           ) CV 161436
                                   )
TASER INTERNATIONAL, INC.,         )
PROFORCE MARKETING, INC., and      )
DOES 1 through 20, inclusive,      )
                                   )
           Defendants.             )
_____)
```

DEPOSITION OF JEFFREY D. HO, M.D.

Wednesday, March 3, 2010

5711 West Century Boulevard, 2nd Floor

Los Angeles, California

8:16 a.m. - 11:46 a.m.

RON FERNICOLA & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
REPORTED BY: SHARON CAHN, CSR NO. 6210
27720 Avenue Scott, Suite 140
Valencia, California 91355
(800) 377-3669

FILE NO. 10181

2

```
 1           SUPERIOR COURT OF THE STATE OF CALIFORNIA
               IN AND FOR THE COUNTY OF SANTA CRUZ
 2

 3

 4

 5

 6   DAVID BUTLER, as Conservator of   )
     the Person and Estate of Steven   )
 7   Alan Butler,                      )
                                       )
 8              Plaintiffs,            )
                                       )
 9       vs.                           ) CV 161436
                                       )
10   TASER INTERNATIONAL, INC.,        )
     PROFORCE MARKETING, INC., and     )
11   DOES 1 through 20, inclusive,     )
                                       )
12              Defendants.            )
     _____)
13

14

15

16

17        Deposition of JEFFREY D. HO, M.D., taken before

18   Sharon Cahn, CSR No. 6210, a Certified Shorthand Reporter

19   for the State of California, with principal office in the

20   County of Orange, commencing at 8:16 a.m., Wednesday,

21   March 3, 2010, in the conference room at the Hilton Hotel

22   located at 5711 West Century Boulevard, San Lorenzo

23   Conference Room C, 2nd Floor, Los Angeles, California.

24

25
```

JEFFREY D. HO, M.D.                                          March 3, 2010

Page 62

```
09:52  1   go through that.  And if there's anything left at the end,
09:52  2   we'll -- we'll try to capture that.
09:52  3        A.   Okay.  What page are you on?
09:52  4        Q.   Well, I'd like to start with Paragraph 8.
09:52  5        A.   Paragraph 8?
09:52  6        Q.   Yes.  It was on Page 2.
09:52  7        A.   Okay.
09:52  8        Q.   "I understand that the Taser X26 ECD
09:52  9   involved in this matter was distributed or sold in July
09:52 10   2006."  That was also the time that the officer received
09:52 11   his updated training with Version 13?
09:52 12        A.   I'm aware of that.
09:53 13        Q.   "As of that time, no peer-reviewed published
09:53 14   scientific or medical literature concluded that the
09:53 15   direct-delivered electrical charge of Taser ECDs cause
09:53 16   ventricular fibrillation or life-threatening cardiac
09:53 17   dysrhythmia in humans."
09:53 18             Now, at that time, there was a letter
09:53 19   published in the New England Journal of Medicine that
09:53 20   appeared to link a ventricular fibrillation in a
09:53 21   14-year-old boy to a taser application; is that correct?
09:53 22        A.   I'm aware of that, yes.
09:53 23             MR. BURTON:  Okay.  And Let me just mark the
09:53 24   letter -- I've got it here somewhere -- Exhibit 3.
09:54 25                    (Plaintiffs' Exhibit 3 was
```

```
09:54  1                 marked for identification by
09:54  2                 the Certified Shorthand Reporter.)
09:54  3    BY MR. BURTON:
09:54  4         Q.   Now, were you a consultant for Taser
09:54  5    International when this letter was published?
09:54  6         A.   I would say at this point, yes.
09:54  7         Q.   Were you a member of the Scientific and
09:54  8    Medical Advisory Board?
09:54  9         A.   No.
09:54 10         Q.   Have you ever been a member of the
09:54 11    Scientific and Medical Advisory Board?
09:54 12         A.   No.
09:54 13         Q.   But do -- do you interact with it?
09:54 14         A.   I do.
09:54 15         Q.   Is there a reason why you're not on the
09:54 16    Board?
09:54 17         A.   Simply because I think it represents a
09:54 18    conflict of interest that I don't want to enter into.
09:54 19         Q.   Now, when this came out, were you asked to
09:54 20    investigate it --
09:54 21         A.   I was asked --
09:54 22         Q.   -- the case?
09:54 23         A.   Yes, I was.
09:54 24         Q.   Was this the first you had learned about
09:54 25    that -- this incident involving this young man, was when
```

**JEFFREY D. HO, M.D.**                                                                 **March 3, 2010**

                                                                                                 64

```
09:55  1   it was published in the New England Journal of Medicine?
09:55  2        A.   I don't believe so.  I believe I knew about
09:55  3   it before this.
09:55  4        Q.   And how -- how did you know about it?
09:55  5        A.   I believe that -- now this is going back
09:55  6   five-plus years, so my memory of the dates may not be 100
09:55  7   percent accurate.  But my recollection was that the
09:55  8   incident that we're talking about occurred, and I was
09:55  9   asked to go to speak with the authorities in Chicago where
09:55 10   this case happened and see if they would talk to me about
09:55 11   the case, provide information, allow me to see some of the
09:55 12   records.
09:55 13        Q.   Well, this incident occurred, I think, on --
09:55 14   I have the date right here -- February 7th, 2005.
09:55 15        A.   Okay.
09:55 16        Q.   The letter was published September 1st,
09:55 17   2005 --
09:55 18        A.   Okay.
09:56 19        Q.   -- according to the documents I have.
09:56 20             So is it your recollection that you found
09:56 21   out about this incident involving this young man --
09:56 22   obviously, after it happened, which would have been
09:56 23   February 7, 2005 -- but before you learned there was going
09:56 24   to be a publication of this case in the New England
09:56 25   Journal of Medicine?
```

| | | |
|---|---|---|
| 10:02 | 1 | Dr. Kim and Dr. Franklin were. This had not, to my |
| 10:02 | 2 | knowledge, come out or was in press. So I would have had |
| 10:02 | 3 | no reason to talk to them at that point. |
| 10:02 | 4 | Q. **Well, were the documents that you looked at,** |
| 10:02 | 5 | **did they include the ER docs?** |
| 10:02 | 6 | A. I don't believe so, no. |
| 10:02 | 7 | Q. **Well, what documents did you review?** |
| 10:02 | 8 | A. I believe there was an -- well, again, this |
| 10:02 | 9 | ==is five years ago. I believe there was an EMS Run Sheet== |
| 10:02 | 10 | ==that we were allowed to look at. And I'm sure -- I mean,== |
| 10:02 | 11 | ==there must have been other documents, because I'm sure it== |
| 10:02 | 12 | ==wasn't just a single piece of paper we were allowed access== |
| 10:03 | 13 | ==to.== But, again, I remember it being -- they were not very |
| 10:03 | 14 | ==forthcoming in providing us with a lot of information to== |
| 10:03 | 15 | ==just look over.== |
| 10:03 | 16 | Q. **Was a summary or a report prepared at that** |
| 10:03 | 17 | **time by you and/or Dr. Kroll about what you learned about** |
| 10:03 | 18 | **this incident?** |
| 10:03 | 19 | A. Collectively, no. I don't know what |
| 10:03 | 20 | Dr. Kroll did. I did not put down a summary. I know I |
| 10:03 | 21 | was asked to, I think by phone call at some point, just |
| 10:03 | 22 | talk about what my impressions were at that time. |
| 10:03 | 23 | Q. **A phone call with who?** |
| 10:03 | 24 | A. Again, five years ago, I couldn't tell you. |
| 10:03 | 25 | I'm assuming it was probably Mark Johnson, again, just |

```
10:19  1   rhythm, then.
10:19  2          Q.    It's his first EKG, documented EKG rhythm;
10:20  3   correct?
10:20  4          A.    It's the first one that is recorded there.
10:20  5   But his first pulse was 100, which is not consistent with
10:20  6   ventricular fibrillation.
10:20  7          Q.    Well, where does this 23 minutes from the
10:20  8   taser application to the ventricular fibrillation
10:20  9   indicated in the report, where does that come from?
10:20 10          A.    Again, I couldn't tell you where it comes
10:20 11   from.  I don't recognize this report.  And as I'm sitting
10:20 12   here today, as I told you, this was a very unstructured
10:20 13   meeting with Chicago City officials in some capacity.  For
10:20 14   all I know, we asked questions and they gave us times off
10:20 15   whatever documents they had.  They may not have put this
10:20 16   document in front of us.  I don't know.
10:20 17                We were -- we walked out of that room with
10:20 18   what we felt was the best information given to us that we
10:20 19   could make -- make an assessment of the case on.
10:21 20          Q.    It says, "Paramedics on the scene --
10:21 21   Paramedics on the scene" -- this is back to Exhibit 5,
10:21 22   Dr. Kroll's letter -- "reported the subject was awake and
10:21 23   responsive and had normal pulse and lung sounds
10:21 24   immediately after the taser application."
10:21 25                Did you see something that said that the
```

JEFFREY D. HO, M.D.                                        March 3, 2010

Page 86

| | | |
|---|---|---|
| 10:24 | 1 | ambulance and found him to be in ventricular fibrillation. |
| 10:24 | 2 | And I think that's still true today. |
| 10:24 | 3 | Q.   Okay.  And that was his initial rhythm that |
| 10:24 | 4 | was on the EKG? |
| 10:24 | 5 | A.   That was his initial rhythm on a monitor |
| 10:24 | 6 | that was applied at least two minutes after -- you know, |
| 10:24 | 7 | at least two minutes after the crew was on scene. |
| 10:24 | 8 | Q.   Now, do you think that this young man had a |
| 10:24 | 9 | cardiac arrest because of excited delirium? |
| 10:24 | 10 | A.   I don't know enough about the -- I don't |
| 10:24 | 11 | know enough about the events ahead of time to say on that, |
| 10:24 | 12 | and I don't know all of his medical history and things |
| 10:25 | 13 | like that.  So it would be very difficult for me to say |
| 10:25 | 14 | whether or not this was excited delirium. |
| 10:25 | 15 |      I do think that, you know, it's obvious that |
| 10:25 | 16 | he had a cardiac arrest.  It doesn't sound like this was |
| 10:25 | 17 | electrically induced.  It sounds like it could be from any |
| 10:25 | 18 | number of different causes.  I just need to know more |
| 10:25 | 19 | about his history. |
| 10:25 | 20 | Q.   Well, it says here in the next -- the bottom |
| 10:25 | 21 | paragraph, "The rhythm strips shown in Dr. Kim and |
| 10:25 | 22 | Franklin's letter does, indeed, show an apparent |
| 10:25 | 23 | successful defibrillation.  What should have been made |
| 10:25 | 24 | clear, however, was the fact that this strip was recorded |
| 10:25 | 25 | approximately 23 minutes after taser application and |

```
10:25  1   9 minutes into the resuscitative attempt after 3 previous
10:25  2   shocks.  The initial medical problem cannot be diagnosed
10:25  3   from the data provided.  In fact, the EMS record notes an
10:25  4   idioventricular pulseless rhythm, which may have been the
10:25  5   cause of the initial collapse."
10:25  6              In fact, the EMS records show that the
10:25  7   initial rhythm was ventricular fibrillation, not pulseless
10:26  8   idioventricular rhythm; correct?
10:26  9        A.    I would agree, it doesn't say "pulseless
10:26 10   idioventricular rhythm".  But you keep saying the initial
10:26 11   rhythm.  And I'll keep saying that ventricular
10:26 12   fibrillation was not the initial rhythm when they record a
10:26 13   pulse of 100.  That's not possible.
10:26 14        Q.    "Of further interest" -- and I'm going onto
10:26 15   the next page -- "it is not uncommon for first responders
10:26 16   to apply defibrillation shocks in attempts to resuscitate
10:26 17   a subject experiencing non-fibrillation type arrhythmias."
10:26 18              Is that true?
10:26 19        A.    That is known to occur.
10:26 20        Q.    But it's not common, is it?
10:26 21        A.    I would say it's not rare.  I mean, does it
10:26 22   happen every day?  Maybe not.  But one of the things that
10:26 23   they are taught is if they see a rhythm that they are
10:27 24   unsure of, such as asystole that could represent fine
10:27 25   ventricular fibrillation, they are instructed to go ahead
```

Page 92

10:44  1   that on mine.  Oh, I'm sorry, it does, right here on the
10:44  2   left.  It's very hard to see.
10:44  3          Q.    Right.  It's very hard to see.  This is how
10:44  4   I got it from -- from -- from Taser.
10:44  5                So it appears that what -- and this wasn't a
10:44  6   360 joule shock.
10:44  7                It appears that what the authors did is --
10:44  8   is somebody put the strip for the Shock 1 instead of the
10:44  9   strip for Shock 4 in the report.
10:44 10          A.    Okay.
10:44 11          Q.    Does that seem to make sense?
10:44 12          A.    Sure.
10:44 13          Q.    Okay.  Well, does that make -- other than,
10:44 14   obviously, being an error -- and I know we pointed out a
10:44 15   typo in one of your articles once, for example -- other
10:45 16   than being an error, is this error any way material to the
10:45 17   case report or the conclusions that -- that you can think
10:45 18   of?
10:45 19          A.    You know, it actually is somewhat material
10:45 20   in the standpoint of this required -- at least from what's
10:45 21   provided here to me -- at least four shocks of
10:45 22   defibrillation.  Correct?
10:45 23          Q.    Right.  But they say that on the front -- on
10:45 24   the front page.
10:45 25          A.    Right.  And, again, it kind of speaks to the

93

```
10:45  1   same thing that's occurring in this case with Mr. Butler.
10:45  2   If you believe that this is a electrically-induced
10:45  3   phenomena, then the appropriate thing would be quick
10:45  4   defibrillation, which it sounds like this was immediately
10:45  5   recognized, and the appropriate response should be
10:45  6   immediate successful defibrillation back into normal sinus
10:45  7   rhythm, which is not what occurred here.  Which leads me
10:46  8   to believe that there is likely something else going on.
10:46  9        Q.   Okay.  But -- but I'm asking if the report
10:46 10   is misleading -- because it says in the report on the
10:46 11   prior page, "After four shocks and the administration of
10:46 12   epinephrine, atropine and lidocaine, a profusing rhythm
10:46 13   was restored".  And it says "Figure 1B", which, actually,
10:46 14   was the first shock, not the fourth shock.
10:46 15        A.   Okay.  Well --
10:46 16        Q.   But -- but the fact that they mixed up those
10:46 17   two strips -- or somebody did -- doesn't change anything
10:46 18   in this paper, does it?  Because the two strips show
10:46 19   essentially the same thing?
10:46 20        MR. MALEY:  I'm -- I'm -- I'm sorry, John.  I
10:46 21   just -- I don't know what you're asking.  So I've got to
10:46 22   object.  If -- if the witness understands what you're
10:46 23   asking -- I just don't know what --
10:46 24        THE WITNESS:  I think I know what you're asking,
10:46 25   but I guess I'm not -- in my mind, there's two issues
```