UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CORA MITCHELL, on behalf of herself
individually and as Personal Representative
of the Estate of ROBERT MITCHELL,

    Plaintiff,

v.

TASER INTERNATIONAL, INC.,

    Defendant.
_____/

Case No. 09-11480

Hon. John Corbett O'Meara

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the court are the parties' motions for summary judgment, both filed on March 17, 2014, and both of which have been fully briefed. The court heard oral argument on June 26, 2014, and took the matter under advisement. For the reasons explained below, Defendant's motion is granted.

### BACKGROUND FACTS

Plaintiff Cora Mitchell is the mother of Robert Mitchell and the personal representative of his estate. On April 10, 2009, Robert Mitchell died tragically at age sixteen after Warren Police Officer Jesse Lapham discharged his "taser" into

Mitchell's chest and he suffered a cardiac arrest. Defendant TASER International, Inc., manufactures the product used by Officer Lapham, the Model X26 conducted electrical weapon (CEW).[1] Plaintiff alleges various theories of product liability against TASER: failure to warn, gross negligence, negligence, express warranty, and implied warranty.

## LAW AND ANALYSIS

### I.   Defendant's Motion

#### A.   Failure to Warn

In order to establish a prima facie case of negligent failure to warn of a known danger, the plaintiff in a products liability action must show that "(1) the defendant owed the plaintiff a duty to warn of the danger, (2) the defendant breached that duty, (3) the defendant's breach was the proximate and actual cause of the plaintiff's injury, and (4) the plaintiff suffered damages as a result." Tasca v. GTE Prods. Corp., 175 Mich. App. 617, 622 (1988). Plaintiff contends that TASER was aware of the potential for a X26 shot to the chest to cause heart arrhythmias and that TASER failed to warn of the danger. Defendant asserts that it did not have a duty to warn of the "remote" cardiac risk and that, if it had, there is

---

[1] Co-defendant Michigan Taser Distributing, Inc., has been dismissed by stipulation.

no evidence that Officer Lapham would have read or heeded such a warning.

### 1. Duty to Warn

Under Michigan law, a manufacturer is not liable for an alleged failure to warn "unless the plaintiff proves that the manufacturer knew or should have known about the risk of harm based on the scientific, technical, or medical information reasonably available at the time the specific unit of the product left the control of the manufacturer." M.C.L. §600.2948(3). See also Glittenberg v. Doughboy Recreational Indus., 441 Mich. 379, 389-90 (1992) (in order to have a duty to warn, the manufacturer must have "actual or constructive knowledge of the claimed danger"). TASER contends that as of the date the X26s were shipped to the Warren Police Department – August 24, 2006 – it had "no knowledge of human VF [ventricular fibrillation] risks from the use of its CEW products." Def.'s Br. at 16.

In support of its argument that TASER knew of the risk of chest shots, Plaintiff points to two articles that were published in July 2006 in the *Journal of the American College of Cardiology*. See Pl.'s Ex. 9 (Lakkireddy/Tchou study) and Ex. 11 (Nanthakumar study). Both studies tested the effect of an X26 on cardiac rhythm in sedated pigs. In the Nanthakumar study, they analyzed 150 discharges, finding that discharges to the chest area of the pigs often resulted in

"myocardial [heart muscle] stimulation and capture [pacing]." Pl.'s Ex. 9 at 3. After administering epineprhine to simulate stress, they induced ventricular fibrillation ("VF") once in one pig. Id.

The Nanthakumar study's authors concluded that "[w]hen the discharge was vectored across the chest, electrical and mechanical capture [pacing] of the heart ensued." Pl.'s Ex. 9 at 6. "We also found that discharges away from the chest did not stimulate the heart or trigger arrhythmias." Id. Among other study limitations, the authors noted that "[t]he threshhold for induction of VF in pigs may be lower than in humans, and the structural variation in the chest wall anatomy is another limitation with regard to extrapolating our model to humans." Id. at 7. The authors concluded that "[t]his study *suggests* that NIDs [neuromuscular incapacitating devices] *may* have cardiac risks that require further investigation in humans." Id. (emphasis added).

In response to criticisms of the study, Nanthakumar stated: "The main point of our study was to demonstrate that electrical capture of the myocardium, under specific circumstances, can occur after neuromuscular incapacitating device (NID) discharge. . . .We agree that it is not possible to directly extrapolate our results to NID use in humans. . . . We did not state that NIDs cause ventricular fibrillation in humans, and we agree that we cannot conclude from our study that NID discharges

cause arrhythmias in typical use. We hope that readers agree that our study does suggest the possibility that NIDs may, in some circumstances, cause cardiac capture, and that this possibility should at least be considered in future research in humans." Def.'s Ex. 48.

The Lakkireddy/Tchou study considered "cocaine's effects on Taser-induced ventricular fibrillation (VF) threshold in a pig model." Pl.'s Ex. 9 at 1. It concluded that "the presence of cocaine decreases the likelihood of NMI-induced VF." Id. at 5. They noted, however, that "[o]ur study is the first to describe capture of ventricular myocardium during application of NMI pulses." This data "suggest the potential for induction of ventricular tachycardia [abnormal rapid heartbeat] in subjects with substrate for ventricular tachycardia. . . ." and that "avoidance" of discharges near the heart "would greatly reduce any concern for induction of ventricular arrhythmias." Id. However, "[o]ur study showed that VF could not be induced using the standard 5-s Taser discharge applied to a pig's body surface even at the most sensitive area tested." Id. at 5. "The results of our study and the few prior animal studies would suggest that NMI discharge at the standard 5-s application is unlikely to cause life-threatening arrhythmias, at least in the normal heart." Id.

These studies do not establish TASER's knowledge regarding the risk of VF

or cardiac arrest in humans as a result of X26 shots to the chest. The Nanthakumar study "*suggests* that NIDs [neuromuscular incapacitating devices] *may* have cardiac risks that require *further investigation* in humans." The Lakkireddy/Tchou study found that a standard X26 discharge is *"unlikely* to cause life-threatening arrhythmias, at least in the normal heart." Tchou testified that "because of our capture data, I would caution them [TASER] that there is *some possibility* that this *could* induce ventricular arrhythmias in people." Pl.'s Ex. 42 at 90 (emphasis added). At most, these studies suggest a theoretical risk as of August 2006, when TASER shipped the X26s to the Warren Police Department. This theoretical risk is not sufficient to trigger a duty to warn under Michigan law. See Greene v. A.P. Prods. Ltd., 475 Mich. 502, 504 (2006) ("We conclude that the statute imposes a duty to warn that extends only to *material* risks not obvious to a reasonably prudent product user. . . ."); M.C.L. § 600.2948(3) (manufacturer's knowledge is judged against the "scientific, technical, or medical information reasonably available at the time" of sale).

      Plaintiff contends, however, that TASER also had a *post-sale* duty to warn, based upon subsequent studies and information that came to light after August 2006. See M.C.L. 600.2948(4) ("This section does not limit a manufacturer's duty to use reasonable care in relation to a product after the product has left the

manufacturer's control."); Comstock v. General Motors Corp., 358 Mich. 163, 177-78 (1959). Plaintiff suggests that the Michigan courts would apply the post-sale duty to warn test contained in Restatement (Third) of Torts Products Liability § 10. Michigan law does not, however, impose a post-sale duty to warn in this context.[2]

In Comstock, the Michigan Supreme Court held that a manufacturer had a post-manufacture duty to warn of latent defects once the manufacturer discovered the problem. Comstock involved the failure of brakes in an automobile. The latent defect was a manufacturing defect in a sealer that allowed brake fluid to escape. Shortly after sale of the vehicles, General Motors learned of numerous failures attributed to defective sealers and directed its dealers to repair the brakes at no cost to the vehicle owners. The Comstock court reasoned that "[i]f such duty to warn of a known danger exists at point of sale . . . a like duty to give prompt warning exists when a latent defect, which makes the product hazardous to life becomes known to

---

[2] No Michigan court has adopted this Restatement provision, which is not consistent with existing Michigan law as described below. See also Hoffner v. Lanctoe, 492 Mich. 450, 478-79 (2012) ("We begin with the general observation that this Court has never adopted wholesale the Restatement approach. While this Court has looked to the Restatement for guidance, it is our caselaw, as developed through the years, that provides the rule of law for this State.").

the manufacturer shortly after the product has been put on the market." 358 Mich. at 177-78.

Subsequently, the Michigan Supreme Court stated, regarding Comstock, "[i]n the unique context in which the manufacturer acknowledged the existence of a *latent manufacturing* defect, as evidenced by numerous failures and the offer to repair, the Court imposed a duty to warn." Gregory v. Cincinnati Inc., 450 Mich. 1, 18 (1995) (emphasis in original). A latent defect is "a defect present but unknown and unforeseeable at the point of sale." Id. at 20 n.22. The court further noted "we . . . have never held that any postmanufacture duties can arise from subsequently discovered knowledge unattributable to a defect at the time of manufacture." Id.

In this case, Plaintiff has not identified any latent manufacturing defect in the X26, but rather contends that TASER knew or should have known of the risk of chest shots. "Because latency is not at issue in this case, the premise recognized in *Comstock* for imposing a duty to warn is lacking." Id. at 22 n.25. See also Ray v. Rheem Textile Sys. Inc., 2002 WL 433157 at *4 (Mich. App. Mar. 19, 2002) ("Because the only recognized postmanufacture duty to warn in this state involves latent defects, plaintiff's failure to specify a latent defect was fatal to this theory of recovery and the court properly excluded it."); Blackburn v. Eagle Manuf. Co., 1998 WL 2001199 at *4 (Mich. App. Mar. 20, 1998) (no postmanufacture duty to

disseminate updated warnings). Accordingly, Michigan law does not impose a post-sale duty to warn under these circumstances.

Plaintiff also argues that because TASER "assumed to act" by offering its training program and training materials, it was required to do so with due care. An analogous "negligent assumption of duty" theory has been rejected by the Michigan Court of Appeals:

> Plaintiff characterized this theory as a "negligent assumption of duty" theory and argued that even if, as defendant argued, defendant did not initially have any postmanufacture duty to warn, it voluntarily assumed such a duty by distributing to its dealers and distributors the dealer bulletins and retrofit kits postmanufacture. The court excluded this theory of recovery on the basis that there was no legal authority for this proposition. We agree. Under *Gregory*, the law is clear that no postmanufacture duty to repair, retrofit, or recall is recognized in this state.

Ray, 2002 WL 433157 at *6. See also Gregory, 450 Mich. at 27 ("Although Cincinnati forwarded nearly thirty mailings documenting various safety options, this does not create such a unique or controlling relationship as to justify a duty to repair or recall the product."). Beyond the general proposition that, having assumed to act, a person must do so with due care, Plaintiff has not presented authority for the proposition that TASER's training materials created a post-manufacture duty to warn under Michigan law.

### 2. **Proximate Cause**

Moreover, even if a continuing duty to warn existed, Plaintiff has not shown that updated warnings regarding chest shots would have been distributed to Officer Lapham. Generally, "proximate cause is not established absent a showing that the plaintiff would have altered his behavior in response to a warning." Allen v. Owens-Corning Fiberglas Corp., 225 Mich. App. 397, 407 (1997). See also Eiben v. Gorilla Ladder Co., 2013 WL 1721677 at *17-18 (E.D. Mich. 2013) (Rosen, C.J.) (no failure to warn claim where plaintiff testified that he did not read warnings or owner's manual before using ladder).

Although Officer Lapham received a full day of training from the Warren Police Department regarding his X26 and received the product manual, the record reflects that he did not see TASER's PowerPoint presentation and did not recall seeing any TASER warning document, including those effective March 1, 2007 and April 28, 2008. Ex. 21 at 16; Ex. 22 at 19-22. Thus, even if TASER had provided a warning regarding the cardiac risk of chest shots, there is no evidence that warning would have been distributed to Officer Lapham, given that he did not see any of the other warning documents provided by TASER. See Bachtel v. TASER Int'l, Inc., 747 F.3d 965, 972 (8th Cir. 2014) ("We conclude that there is no genuine dispute on this record that Officer Baird would not have read any

additional warning TASER may have added as to the cardiac danger of the X26 ECD in any of its product warnings or bulletins."); Cf. Fontenot v. TASER Int'l, Inc., 736 F.3d 318, 332 (4th Cir. 2013) (because police department issued memorandum "relaying the additional safety information provided" by TASER, jury could reasonably infer that additional warning would have been distributed to and heeded by officers).

Plaintiff's contention that the WPD would have changed its training in response to a chest shot warning is based upon speculation[3] and is belied by the evidence in the record that WPD did not communicate the most recent warnings to Officer Lapham and that WPD did not follow comprehensively the training program that TASER provided (for example, by showing the PowerPoint presentation). Had WPD done so, the jury could infer that new or additional warnings would have been communicated to Officer Lapham. As the record stands, there is no reasonable basis for such an inference. See id.

Because Plaintiff has not demonstrated a duty to warn or proximate cause, she cannot sustain her negligent failure to warn claim as a matter of law.

---

[3] See Pl.'s Ex. 37 (Howell Dep. at 73-74) ("I'm saying I may have found that information. I may have provided it to the sergeant. The sergeant may have given it to the lieutenant, and he may have given it to the captain. Whoever writes the policies may have then said, 'Based on this, we're going to rewrite our policy, and we're going to do this.'").

### B. Gross Negligence

Absent a showing of negligence, Plaintiff's gross negligence claim also fails. Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern whether injury results." M.C.L. 600.2945(d). See also Xu v. Gay, 257 Mich. App. 263, 271 (2003) ("Evidence of ordinary negligence does not create a question of fact regarding gross negligence."). Given the court's finding that TASER did not have a duty to warn regarding the cardiac risk of chest shots, Plaintiff cannot show that TASER was reckless in failing to do so.

### C. Breach of Express/Implied Warranty

Defendant contends that Plaintiff's breach of express and implied warranty claims fail because it properly disclaimed any such warranties in its operating manual:

> **TASER'S WARRANTY AS STATED ABOVE IS THE EXCLUSIVE WARRANTY WITH RESPECT TO THIS PRODUCT. TASER DISCLAIMS ANY AND ALL OTHER WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, DESIGN OR FITNESS FOR A PARTICULAR PURPOSE OR ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE, OR ANY WARRANTY AGAINST PATENT INFRINGEMENT.**

Def.'s Ex. 17G at 23-25. Plaintiff suggests that this disclaimer, located at the end

of the twenty-five page manual, is not conspicuous. See M.C.L. 440.2316(2) (exclusion of implied warranty of merchantability must be "conspicuous"). The disclaimer is clearly stated in capitals and bold print, however, and is consistent with the statutory definition of "conspicuous": "written, displayed, or presented [so] that a reasonable person against which it is to operate ought to have noticed it." M.C.L. 440.1201(j) ("Whether a term is 'conspicuous' or not is a decision for the court."). The court finds that this disclaimer serves to disclaim any implied warranty.

Express warranties are governed by M.C.L. 440.2313(1), which provides that express warranties are created by "[a]n affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain. . . ." Id. Plaintiff has not provided evidence that promises regarding cardiac safety were part of the "basis of the bargain" between WPD and TASER. See Heritage Resources, Inc. v. Caterpillar Fin. Servs. Corp., 284 Mich. App. 617, 634-35 (2009) ("An express warranty may be created only between a seller and a buyer, and any such express warranty becomes a term of the contract itself."). Accordingly, Plaintiff's warranty claims are subject to dismissal.

## **ORDER**

IT IS HEREBY ORDERED that Defendant's motion for summary judgment

(Docket No. 191) is GRANTED.  Judgment will be entered in favor of Defendant TASER International, Inc.

IT IS FURTHER ORDERED that Plaintiff's motion for partial summary judgment (Docket No. 192), Plaintiff's motion to amend complaint (Docket No. 230), Defendant's motions to exclude expert testimony (Docket Nos. 189, 190, 196), and Defendant's motion to strike exhibits to Plaintiff's summary judgment response (Docket No. 247) are DENIED AS MOOT.

        s/John Corbett O'Meara
        United States District Judge

Date:  July 23, 2014


I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, July 23, 2014, using the ECF system.

        s/William Barkholz
        Case Manager